# Commonwealth ex rel. v. Lenhart, Appellant.

*Courts—Questions of law—Duties of associate judges.*

1. Where the president judge dismisses a petition for a writ of mandamus upon undisputed facts, two associate judges of the court, who are unlearned in the law, have no power to file a so called dissenting opinion holding that the prayer of the petition should be granted and directing a writ of peremptory mandamus to issue.

*Elections—Primary elections—Candidates—Withdrawal of candi* *.tes — Substitutions — County commissioners — Mandamus — Uniform Primary Act of February 17, 1906, Section 8, P. L. 86.*

2. Under the Act of February 17, 1906, P. L. 36, county commissioners are not required to print on the official ballot to be used at a primary election, the name of a candidate for delegate to a state convention, when such candidate did not file with the commissioners a petition to have his name printed on the official ballot until the tenth day before the primary election, and then only petitioned to have his name printed as a substitute for the name of another candidate who had withdrawn, and there still remained two other candidates for state delegates, who had properly petitioned the commissioners.

3. Section 8 of the Act of February 17, 1906, P. L. 36, relates solely to the holding of or the manner of conducting the primaries on election day by the election officers. It has nothing to do with the things connected with or leading up to the primary election.

Argued April 14, 1913.   Appeal, No. 175, Jan. T., 1913, by defendants, from decree of C. P. Columbia Co., by associate judges in No. 197, May T., 1912, awarding writ of peremptory mandamus in Commonwealth of Pennsylvania, ex rel., George G. Crisman, N. B. Shales, E. S. Martz, H. H. Linden, George A. Confair, Harry C. Smith, Verncel R. Crisman, J. A. Laub, W. W. Shannon and A. H. Klase v. C. Fred Lenhart, Charles E. Welliver and George S. Fleckenstine, Commissioners of Columbia County.   Before BROWN, MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ.   Reversed.

Petition for writ of mandamus.

The facts appear in the opinion by EVANS, P. J., as follows:

This is a proceeding by mandamus to compel the county commissioners to accept and file in their office the petition of George G. Crisman as a candidate for delegate to the Republican State Convention, and to print his name as a candidate for delegate to the said convention on the official ballot for the primary election to be held April 13, 1912; and in case it is too late to print Crisman's name on said ballot, then to prepare and distribute with the ballots slips of paper bearing the name of said Crisman as a delegate to said convention.

The case comes before the court upon petition, return and agreement of counsel. There is no controversy or dispute about the facts. The only question involved is one of law.

From the pleadings the following material facts appear:

(1) Under the rules of the Republican party of the State of Pennsylvania, the County of Columbia is entitled to elect two delegates to the Republican State Convention for 1912 at the primary election to be held April 13, 1912, and this fact was duly certified January 27th, 1912, to the county commissioners.

(2) Petitions to have their names printed on the official ballot for said primary election as candidates for delegates to the Republican State Convention were duly filed in the office of the county commissioners within the time prescribed by law by J. Fred Eves, John R. Deimer, Charles E. Cooper and James E. Smith. The two former filed no requests for printing the name of the candidate whom they will support in the convention. The two latter however filed such requests.

(3) The original petitions of Cooper and Smith were filed March 23, 1912. On March 30, 1912, they withdrew their names as candidates for State delegates by papers in writing filed in the proper office.

(4) April 3, 1912, the tenth day before the date of the ensuing primary, George G. Crisman offered to file with the county commissioners his petition—signed by two-thirds of the signers of Smith's original petition, praying that his (Crisman's) name should be substituted as a candidate for State delegate on the official primary ballot for the ensuing primary election in the place of the name of James E. Smith.

(5) The county commissioners declined and refused to accept and file the said petition of George G. Crisman or substitute his name as prayed for.

The exact question for determination therefore is: Can the county commissioners lawfully be required to accept and file the petition of George G. Crisman as a candidate for delegate to the Republican State Convention and print his name—substitute his name—for that of James E. Smith on the official ballot for the ensuing primary election, and in case it is too late to print his name on said ballot, then to prepare and distribute with the official ballots slips of paper bearing his name as a candidate for delegate to said convention?

Primary elections are governed and controlled by statute. The Uniform Primary Act of Feb. 17, 1906, P. L. 36, puts under control of positive law party nominations for public office and for delegates to State and National conventions.

Upon the argument it was frankly admitted that the Act of Feb. 17, 1906, "providing a uniform method of electing......delegates to the State and National conventions," does not expressly provide for, or authorize any such substitution. It was contended however on the part of Mr. Crisman that while the Act of Feb. 17, 1906, does not expressly provide for a case of this kind, it does enact, Section 8, that "primaries shall be conducted in conformity with the laws governing the conduct of general elections"; and that the Act of June 10, 1893, P. L. 419 "regulating the election of public officers," Section 11, does provide for such substitution, in

cases where the original candidate has withdrawn. This contention is not tenable. Section 8 of the Act of Feb. 17, 1916, reads as follows:

"The primaries shall be conducted by the regular election boards, duly elected under existing laws, who shall receive one-half the compensation for their services that they receive at elections. Inspectors of election shall have the right to appoint clerks to assist them, as at elections, who shall receive one-half the compensation that clerks receive for such services at elections. Vacancies on election boards shall be filled in the manner now provided by law. Before entering upon their duties the election officers and clerks shall be sworn, as is now required by law.

"The polls shall be open between the hours of two post meridian and eight post meridian: Provided, That all persons licensed to sell liquors, either at wholesale or retail, or as bottlers, shall be compelled to keep their places of business closed on said days for holding said primary elections, only between the hours of one o'clock post meridian and nine o'clock post meridian.

"Primaries shall be conducted in conformity with the laws governing the conduct of general elections in so far as the same are not modified by the provisions of this act or are not inconsistent with its terms; But, provided, That no elector shall be permitted to receive any assistance in marking his ballot, unless he shall first make an affidavit that he cannot read the names on the ballot, or that by reason of physical disability he is unable to mark his ballot."

A careful reading of this entire 8th Section of the act clearly indicates that it relates solely to the manner of conducting the primary on the day of holding the same. It begins by enacting who shall constitute the boards; fixes their pay; designates the hours when the polls shall be open; prescribes the oath to be taken by the election officers; provides for other details relating to the things to be done on the day of election, and its actual conduct,

and then follows the provision that in all other particulars, not modified by this act, "the primaries shall be conducted under the laws governing the conduct of general elections."

All this unquestionably refers simply to the manner, method and details of holding or conducting the primary elections. The county commissioners prepare, make provision for holding, for conducting the primaries, days before the same are held. They deliver the ballots to the proper election officer before the day of holding the primary. On the day designated by law the election officers hold and conduct the primary election. Section 5 of the act provides that "the county commissioners shall have on file in their office, at least one week preceding the primary, open to public inspection, forms of the ballots with the names printed thereon, which shall be used in each election district within such county."

The Act of June 10, 1893, P. L. 419, regulating the nomination and election of public officers, designates how elections shall be conducted, at great length and in great detail. Provision is made in Section 18 for the procuring of other ballots in case the ballots to be furnished to any voting place shall fail for any reason to be delivered, or in case after delivery they shall be destroyed or stolen. Section 20 enacts that at the opening of the polls the seals of the package of ballots for use shall be publicly broken and the package opened by the judge of elections. Section 21 enacts that any person desiring to vote shall give his name and residence to one of the election officers in charge of the ballots, who shall thereupon announce the same in a loud and distinct tone of voice. If the person's name is found upon the ballot check list by the inspector or clerk in charge thereof, he shall likewise repeat the said name. As soon as a voter is admitted within the rail the election officer having charge of the ballots shall detach a ballot from the stub and give it to the said voter, but shall first fold it

so that the words printed on the back and outside as provided in Section 15 of this act shall be the only wording visible and no ballot shall be voted unless folded in the same manner. Not more than one ballot shall be given to a voter except as is provided in Section 25 of this act.

None of these provisions for the holding, for the conducting of the primary elections are found in the Uniform Primary Act of Feb. 17, 1906. Neither do we find anything in the act inconsistent with these provisions. It is therefore most apparent that the clause in Section 8, "Primaries shall be conducted in conformity with the laws governing the conduct of general elections in so far as the same are not modified by the provisions of this act or are not inconsistent with its terms," relates solely to the holding of, or the manner of conducting the primaries on election day by the election officers. This language was most aptly chosen by the scrivener in drafting the act. And further, this language cannot reasonably be stretched to sweep in every act and thing connected with or leading up to a primary election, whether it is in any way connected with the holding of the election or not. It can not, in reason, be taken to include an act of the county commissioners in substituting a name on the official ballot which act must of necessity be performed a number of days before the primary election is held.

The Act of 1893, under which it is claimed substitution is authorized, relates solely to the election and nomination of "public officers." It makes no mention directly or otherwise, to delegates to State conventions. It was not until the passage of the Uniform Primaries Act of 1906 that the election of such delegates was regulated by statute. There is nothing in the latter act providing for substitution such as is asked for in this proceeding. Neither can it be reasonably contended that the Act of 1906 authorizes such a substitution by reference to the "laws governing the conduct of general elec-

tions," for the reason that this reference relates only to the method and manner of conducting the primary election on the days of its holding, and not to all the provisions of the former law generally.

There is no vacancy here, there are two candidates for State delegate on the Republican ticket, the number certified to the county commissioners by the Republican State chairman that should be elected. Section 11 of the Act of June 10, 1893, P. L. 419, which is "An act to regulate the nomination and election of public officers" as expressed in the title, contemplates a vacancy on a ticket, occasioned by the death, or withdrawal of a candidate for public office, after he is nominated.

The Act of 1906 has been construed strictly and literally and its provisions are mandatory upon the county commissioners: Commonwealth v. Blankenburg, 218 Pa. 339.

And now April 9th, 1912, in accordance with the views herein expressed the writ of peremptory mandamus should be refused, at the costs of the petitioner.

On the same day EVANS, P. J., filed his opinion HAUCK, J., and KRICKBAUM, J., filed an opinion dissenting from the opinion of EVANS, P. J., and awarding a peremptory mandamus upon the county commissioners. From this order of the associate judges the commissioners appealed.

*Error assigned* was the final order of the associate judges.

*Fred Ikeler,* with him *Clinton Herring,* for appellants.

Appellee submitted no paper book.

OPINION BY MR. JUSTICE BROWN, May 19, 1913:

Whether the mandamus prayed for in the court below should have issued was a pure question of law. On undisputed facts the learned president judge dismissed the

petition for it, but his two associates, unlearned in the law, filed what they called a dissenting opinion, in which they held that the prayer of the petition should be granted, and they thereupon directed a writ of peremptory mandamus to issue. They were elected as judges unlearned in the law, and, if men of ordinary intelligence, ought to have known that it was never contemplated by the Constitution that they should ever set up their judgment against that of the head of the court on a matter of law. They were never intended for any such purpose, and we have so said in the rare instances of judicial impropriety of which they are guilty. In Syracuse Pit Hole Oil Co. v. Carothers, 63 Pa. 379, the late Judge TRUNKEY, of this court, while presiding in a lower court, discharged a rule for a new trial. Subsequently his two lay associates made it absolute. In reversing and setting aside the order granted by the two lay judges, we said: "It was a step in the wrong direction for associates to interfere in a matter of this kind, and it is to be hoped that the example will not be followed. If such a proceeding could be tolerated, litigation would but begin where it ought to end, with the judgment." Another case to which reference may be made is Glamorgan Iron Co. v. Snyder, 84 Pa. 397. There the two lay judges undertook to overrule the action of the trial judge on a motion for a new trial. In reversing their action it was appropriately said: "For many purposes the associate judges of the several counties of the Commonwealth have formed a most useful class of public officers. In the absence of the president judge, their services have been almost indispensable where formal judicial action in vacation has been required in the current practice of the courts. Wherever two or more counties have constituted a district, their local knowledge has been found to be an essential aid in adjusting questions relating to the values of property, to appointments of minor officers, to bail, and to the selection of viewers, appraisers and inquests in the Or-

phans' Court and Quarter Sessions.   In the minor details of the business of the Common Pleas also, president judges have been able to rely safely on their judgment, integrity and business experience.   But in the conduct of jury trials they have usually not sought to interfere, and usually their interference has not been invited.   The purely legal business of a court of original jurisdiction must be subject to the control of a single judge, if efficiency, promptitude, and official responsibility are worth maintaining.   If the deliberately formed purpose of a president judge may be thwarted and overturned by action on the part of his associates which must necessarily be ill-considered and may often be prejudiced, rules of law will be subordinated to individual caprice. The president is the constitutional head of the court, under responsibilities to the community which a court of review can always enforce, and hedged around by duties and obligations for the performance of which no other guaranty is needed than his regard for his own professional reputation.   The fact that in Pennsylvania there has been no failure in the due discharge of those duties and obligations, is adequate proof that the exercise of supervisory and appellate jurisdiction by associate judges is, to state the conclusion in the mildest form, entirely superfluous."

As might have been expected, the two associate judges blundered when they undertook to put a construction upon the Act of 1906 different from that put upon it by the president judge.   Upon his opinion, refusing the mandamus, the order made by those judges is reversed and the petition is dismissed, the costs here and below to be paid by the relators.